**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 2, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

FRANCISCO ALBERTO
TERREROS-GUARIN; MARIA
BEATRIZ AGUIRRE-SALAZAR,

Petitioners,

v.

ERIC H. HOLDER, JR.,
United States Attorney General,

Respondent.

No. 09-9506
(Petition for Review)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **O'BRIEN**, **PORFILIO**, and **TYMKOVICH**, Circuit Judges.

_____

Francisco Alberto Terreros-Guarin and his wife, Maria Beatriz Aguirre-Salazar, are natives and citizens of Colombia. They petition for review of a final order of removal entered by the Board of Immigration Appeals (BIA) denying their applications for asylum, restriction on removal, and protection under the

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. _See_ Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Convention Against Torture (CAT).[1]  We lack jurisdiction to review the BIA's determination that their asylum application was untimely filed and that no changed or extraordinary circumstances excused its untimeliness.  We exercise jurisdiction over the remainder of their claims under 8 U.S.C. § 1252(a)(1), and deny the petition.

## Background

Petitioners entered the United States on January 29, 2000, as holders of B-1/B-2 tourist or business visas.  They overstayed the six-month visa period.  On February 20, 2002, over two years after their arrival, Mr. Terreros applied for asylum and restriction of removal, identifying his wife as a derivative beneficiary of his application.[2]  He was subsequently served with a notice to appear in removal proceedings, charging him with overstaying his visa.  He conceded removability on the grounds alleged in the notice to appear.

Mr. Terreros subsequently received a hearing on his asylum application before an immigration judge (IJ).  He was the sole witness at the hearing.  He

---

[1]  Mr. Terreros's application for asylum appears to have included a CAT claim.  But he did not raise any CAT issues before the BIA or this court.  We therefore do not consider any issues relative to the IJ's denial of CAT relief. *See Tulengkey v. Gonzales*, 425 F.3d 1277, 1279 n.1 (10th Cir. 2005).

[2]  The record actually contains three separate asylum applications.  But the IJ found that the later two appeared to be copies of the original application, which he had Mr. Terreros update and sign under oath at the hearing.

claimed to have been persecuted in Colombia on the basis of religion, political opinion, and membership in a particular social group.

Mr. Terreros testified that he was an early Colombian convert to the Mormon church, having been baptized into that church in 1969. In Colombia, he explained, the Mormon religion is associated with the United States, where it originated. In 2000, several Mormon chapels in Colombia were bombed. Mr. Terreros was aware of these bombings when he lived in Colombia. He also testified that he had received threats connected with his membership in the Mormon church.

In a letter he prepared to supplement his asylum application, Mr. Terreros further detailed his involvement with the Mormon church and the reasons Mormons are persecuted in Colombia. He stated he had been ordained as an elder in the church and had been called to a mission in Peru. He served in high-profile roles in the church as a Branch President and Stake Counselor. Mr. Terreros also stated that the church and its members have been persecuted by Communist-oriented terrorist groups, who consider the church an American organization that meddles in Colombian affairs. As further evidence of the danger posed to religious groups in Colombia, he testified that some of his family and friends were victimized by a terrorist attack on a Catholic church in Cali in 1999.

Mr. Terreros also testified concerning the second ground for his asylum claims, his political activities. He stated that he belongs to the Colombian Liberal Party. This is a political party that promotes respect for human rights, freedom, order, and justice.

As with his religion-based claim, Mr. Terreros supplemented his asylum application with a letter describing his political activities and the dangers posed to persons of his political views in Colombia. He noted that he had held political views affiliated with the Liberal Party since his days at college. At the time he left Colombia, the opposing Conservative Party was in power. His party opposed the incumbent government for its alleged weakness in the struggle against terrorism and political assassination. Before leaving Colombia, he was threatened by extreme leftist squadrons. He feared that if returned to Colombia, he would be tortured and killed by leftists with guerilla connections.

As a third ground for his asylum claims, Mr. Terreros cited his membership in a social group comprised of pro-American Colombians. He explained that he had previously worked for the United States consulate in Medellin as an assistant to the vice-consul. He left his employment there in the 1970s, when the State Department decided to close down the consulate for safety reasons. He subsequently obtained work with two American companies, Bechtel and Morrison-Knudson. He last worked for an American company in 1986, when his contract with Morrison-Knudson ended. Mr. Terreros explained that his former

association with American companies put him in danger in Colombia because terrorists target American companies and their employees.

Mr. Terreros testified to three attacks on him and his family that he believed were based on his political and pro-American affiliations. All three incidents occurred in 1999, the year before he came to the United States. During this year, he stated, he and his family "received [many] threats [and] were psychologically tortured." Admin. R. at 363. On April 9, 1999, as they were traveling en route from Medellin at about three o'clock in the afternoon, cars stopped in front of his car and forced him to stop. Ten armed men got out of the cars and began to mistreat him. They accused him of being a CIA agent, of working for U.S. companies, and of "helping exploit some of the wealth of Colombia." *Id.* They threatened to kill him. His wife began crying, and begged the men not to kill them. At the same time, other cars began approaching. The terrorists decided to leave, got in their cars and drove away. Before departing, however, they told him the next time he would not be so safe.

The second attack occurred in September 1999. Mr. Terreros testified that he and his wife left a political meeting at 11:00 p.m. and got in their car to go home. Another car began following them. The passenger in the car behind them pulled out a gun and began shooting at them. Fortunately, they were able to evade the pursuers and return to their home. Mr. Terreros believed that his pursuers were left-wing terrorists who had targeted him because of his political

activities. He testified that he reported this attack to the police but they did nothing about it.

The third attack took place on November 20, 1999. Mr. Terreros was in his car with his wife and children, stopped at a traffic light. A motorcycle drove up next to them, and the men on the motorcycle got out their guns. Mr. Terreros' wife, who was driving, took off at a high rate of speed and drove to a police station. They entered the police station and told the police chief what had happened to them. He told them to go home and that they would do the investigation. But Mr. Terreros testified that there was no investigation.

Within a few months after the third attack, petitioners sold their jewelry business and their home and left Colombia for the United States.

## Analysis

### A. BIA Decisions

The IJ announced his decision at the close of the hearing. While he found Mr. Terreros's testimony generally credible, he denied asylum relief because he found that Mr. Terreros had not filed his application for asylum within one year of his entry into the United States. The IJ further found that there were no extraordinary circumstances or changes in conditions that would allow him to consider the untimely application.

With respect to restriction on removal, the IJ found that Mr. Terreros failed to show that it was more likely than not that his life or liberty would be

threatened in Colombia by the government or at the hands of a group that the government was unable or unwilling to control. He noted that many people in Colombia espouse the same political views as Mr. Terreros and that his views are well represented within the government of Colombia. There are also many Mormons in Colombia and no evidence that he would be targeted there for his religious beliefs. His former employment by the American consulate and American companies did not make him a member of a particular social group for purposes of asylum eligibility. Finally, lawlessness and general criminal conditions do not constitute persecution on any of the statutory grounds.

In a single-member Board decision, the BIA dismissed petitioners' appeal. The BIA agreed with the IJ that the asylum application was time-barred and failed to establish changed or extraordinary circumstances that would excuse the late filing. It further determined that the IJ had properly considered the three 1999 incidents, and that they did not rise to the level of persecution. Petitioners had failed to demonstrate that they would be harmed on account of their Mormon beliefs and church activities, or that Colombians "who have a reputation as pro-American sympathizers or who are affiliated with pro-American interests" constitute a cognizable "social group" under the asylum statutes. Admin. R. at 3. Petitioners were ineligible for restriction on removal because they failed to demonstrate that the Colombian government would be unable or unwilling to protect them from harm, and because there is no evidence that, ten years after the

-7-

three alleged incidents, the unknown assailants are still active and interested in pursuing respondents.

## B. Lack of Jurisdiction

To be considered for asylum, an alien is required to demonstrate by clear and convincing evidence that his application has been filed within one year after his arrival in United States. *See* 8 U.S.C. § 1158(a)(2)(B). This court lacks jurisdiction to review the BIA's determination denying an asylum claim as untimely unless petitioners present a constitutional claim or a question of law. *See Ferry v. Gonzales*, 457 F.3d 1117, 1129-30 (10th Cir. 2006).

Petitioners contend that an exception to the one-year deadline applied in their case. They argue that the BIA erred in determining that changed country conditions in Colombia did not constitute "changed circumstances which materially affect the applicant's eligibility for asylum," such that their failure to file within the one-year deadline should be excused. 8 U.S.C. § 1158(a)(2)(D). But we also lack jurisdiction to review this challenge, which attacks the agency's factual determination underlying its discretionary, non-reviewable decision concerning changed country conditions. *Ferry*, 457 F.3d at 1130 (stating alien's "argument that his pending adjustment of status application qualified as either a changed or extraordinary circumstance to excuse his untimely asylum application is a challenge to an exercise of discretion that remains outside our scope of review.").

Petitioners' arguments concerning the merits of their asylum claims, and purported errors in considering those claims, also cannot succeed.[3] All of these arguments have been mooted by the BIA's unreviewable determination that their asylum application was untimely and therefore could not be considered on the merits.

## C. Restriction on Removal Claims[4]

We turn now to Mr. Terreros' claim for restriction on removal.[5] In

---

[3]  Confusingly, petitioners have not only provided a separate section of their brief specifically concerning restriction of removal, *see* Aplt. Opening Br. at 27-29, but they also appear to have included arguments targeting both asylum and restriction of removal within the "asylum" section of their brief, *see id.* at 12-25. Out of an abundance of caution, we will address the arguments contained in the "asylum" section as restriction-on-removal arguments, to the extent we find indication that particular arguments were intended as an attack on both the BIA's asylum and restriction-on-removal determinations.

[4]  The parties refer to this claim as one for "withholding of removal." Amendments to the Immigration & Naturalization Act made by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), however, changed the terminology to "restriction on removal." See 8 U.S.C. § 1231(b)(3); *Yong Ting Yan v. Gonzales*, 438 F.3d 1249, 1251 n.1 (10th Cir. 2006). Since this case arose after the effective date of the IIRIRA, we refer to this claim as one for "restriction on removal."

[5]  The circuits that have considered the issue hold that unlike asylum, restriction on removal does not allow for derivative beneficiaries such as Mr. Terreros's wife. *See Arif v. Mukasey*, 509 F.3d 677, 681 (5th Cir. 2007) (collecting cases). *And compare* 8 U.S.C. § 1158(b)(3)(A) (asylum statute expressly permitting derivative beneficiaries) *with id.* § 1231(b)(3) (restriction on removal statute, silent as to derivative beneficiaries). Since Mr. Terreros' challenges to denial of restriction on removal fail on the merits, we need not resolve whether his wife could derivatively benefit from the application. But for clarity's sake, we do refer to the claim as being that of Mr. Terreros, rather than

(continued...)

addressing this claim, "we review the BIA's findings of fact under the substantial evidence standard, and its legal determinations de novo." *Hayrapetyan v. Mukasey*, 534 F.3d 1330, 1335 (10th Cir. 2008). "Agency findings of fact are conclusive unless . . . any reasonable adjudicator would be compelled to conclude to the contrary." *Sarr v. Gonzales*, 474 F.3d 783, 788-89 (10th Cir. 2007) (quotation marks omitted). Where, as here, the BIA issues a decision by a single board member, the BIA's decision constitutes the final order of removal, although "we may consult the IJ's opinion to the extent that the BIA relied upon or incorporated it." *Id.* at 790.

Restriction on removal blocks an alien's removal "to a particular country if he or she can establish a clear probability of persecution in that country on the basis of race, religion, nationality, membership in a particular social group, or political opinion." *Elzour v. Ashcroft*, 378 F.3d 1143, 1149 (10th Cir. 2004). The alien can satisfy this standard by showing that he experienced "past persecution" on enumerated grounds or that "it is more likely than not" that he would be persecuted in the future. 8 C.F.R. § 1208.16(b)(1), (2). "Persecution is the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive, and requires more than just restrictions or threats to life and liberty." *Tulengkey v. Gonzales*, 425 F.3d 1277, 1280

---

[5](...continued)
that of both petitioners.

(10th Cir. 2005) (quotation omitted).  The persecution "may be inflicted by the government itself, or by a non-governmental group that the government is unwilling or unable to control."  *Hayrapetyan*, 534 F.3d at 1337 (quotation omitted).

Mr. Terreros first argues that the BIA erred by failing to address his argument that the IJ failed to analyze his claim of political persecution.  While we may remand to the BIA to address an overlooked argument, we will do so only where the ground appears to have substance.  *See id.* at 1335.  That is not the case here, for several reasons.

The IJ made the following findings concerning petitioners' allegations of political persecution:

> The Court further believes that [petitioner] was a member of the Liberal Party.  However, the Government has established through testimony of [petitioner] and the world reports of the State Department that there are many in the government of Colombia who espouse the same political view as the [petitioner] and the [petitioner] is well-represented in his political views within the government of Colombia.

Admin. R. at 127-28.

Notwithstanding the IJ's findings on this issue, Mr. Terreros argued to the BIA that "the IJ *failed to even consider* Mr. Terreros' political opinion as a discrete basis for his asylum claim."  Admin. R. at 44-45 (BIA brief at 21-22) (emphasis added).  But as the quoted language shows, the IJ did consider the claim.

Moreover, it is not clear that Mr. Terreros even presented this argument to the BIA as a restriction-on-removal argument rather than an asylum argument.

Finally, and most importantly, we believe the BIA did give the argument adequate consideration. While the BIA did not explicitly refer to political persecution, it rejected Mr. Terreros' claim that he had been persecuted in the past or would be persecuted in the future on *any* statutory ground. It found that the violent incidents Mr. Terreros described did not rise to the level of persecution; that the Colombian government had taken steps to control the individuals who confronted him; that he had failed to show that the government was unable or unwilling to protect him from harm; and that there was no objective evidence to suggest that the unknown assailants were still active and interested in pursuing him. This reasoning adequately addressed his assertions of political persecution.

Mr. Terreros next argues that the BIA erred in rejecting his assertions that he was persecuted in Colombia on account of his religious beliefs and his membership in a particular social group. The BIA stated that it agreed with the IJ's conclusion that petitioner "failed to demonstrate that the harm [from alleged persecution] was or would be on account of their Mormon beliefs and church activities." *Id.* at 3. Mr. Terreros contends that the evidence does not support this conclusion. In order to grant him relief

-12-

on this claim, however, we would have to find that the evidence compelled a conclusion contrary to that of the BIA. *See Tulengkey*, 425 F.3d at 1280.

Upon consideration, Mr. Terreros has failed to meet this demanding standard. While the evidence does tend to demonstrate that he occupied a significant position within the Mormon Church, and was active in church activities, the BIA's conclusion that he failed to demonstrate prior persecution or the likelihood of future persecution based on his religious activities is supported by substantial evidence and must be upheld.

Mr. Terreros also attacks the BIA's findings that "the particular social group of Colombians who have a reputation as pro-American sympathizers or who are affiliated with pro-American interests" is "too loosely defined to meet the requirement" of a "social group" for purposes of the restriction on removal statute, and that it "lacks social visibility." Admin. R. at 3. We need not determine whether the social group he describes constitutes a legitimate "social group" for purposes of restriction on removal. The BIA's finding, that Mr. Terreros was not persecuted in the past on *any* statutory ground, and

-13-

had failed to show that he was likely to be persecuted in the future on any such ground, represents an adequate ground for its denial of restriction on removal.

The petition for review is DENIED.

Entered for the Court


Timothy M. Tymkovich
Circuit Judge

-14-